## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James Ward,                                    Civil No. 08-837 (ADM/JJK)

        Plaintiff,

v.                                             **REPORT AND**
                                               **RECOMMENDATION**

Warden Duke Terrell,

        Respondent.

James Ward, Inmate No. 12143-041, PMB 4000, Rochester, MN 55903-4000, Petitioner, *pro se*

Erika R. Mozangue, Assistant United States Attorney, United State's Attorney's Office, 300 South 4th Street Suite 600, Minneapolis, MN 55415, for Respondent.

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before this Court on Petitioner's Petition of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. No. 1), Petitioner's Motion for Default Judgment (Doc. No. 7), and Petitioner's Motion to Amend Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J (Doc. No. 11). The matter has been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons discussed below, this Court recommends that Petitioner's Motion for Default Judgment be denied, Petitioner's Motion to Amend Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J be denied as moot, and the Petition of Habeas Corpus Pursuant to 28 U.S.C. § 2241 be dismissed.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

Petitioner is currently confined at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester").  (Doc. No. 6, Decl. of Anne Norenberg ("Norenberg Decl."), ¶ 3 at 1.)  Petitioner is serving a 180-month sentence imposed by the United States District Court for the District of Minnesota for violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2)(E)(1), which prohibit possession of firearms by convicted felons.  (*Id.*)  Petitioner has a projected release date of April 24, 2018, pursuant to a reduction in his overall sentence for good conduct.  (*Id.* at 1-2.)

On April 23, 2006, a FMC Rochester staff member observed Petitioner giving a tattoo to another inmate.  (*Id.* ¶ 4, Attach. B. at 1.)  Petitioner was applying the tattoo to the other inmate's right shoulder using a tattoo gun.  (*Id.* ¶¶ 4-5, Attach. B. at 1, 4.)  Along with the tattoo gun, Petitioner possessed other tattooing equipment including a battery pack, two needles, a bottle of ink, and a drawing.  (*Id.*)  During the initial investigation of the incident, Petitioner stated, "The report is true.  I messed up."  (*Id.* ¶ 4.)

FMC Rochester began disciplinary proceedings against Petitioner shortly after the incident.  (*Id.* ¶ 5, Attach. B. at 4.)  The matter was referred to the Unit Discipline Committee ("UDC") for FMC Rochester for violations of inmate discipline regulations outlined in 28 C.F.R. § 541.13 ("Prohibited Acts Code").[1]

---

[1]      The regulations for Inmate Discipline and Special Housing Units in 28
(Footnote continued on following page)

(*See* Norenberg Decl. ¶ 5, Attach. B. at 4.)  Specifically, Petitioner was charged

with the following violations: "[p]ossession, manufacture, or introduction of a

hazardous tool"; "[b]eing in an unauthorized area"; and "[t]attooing or self-

mutilation." (*Id.*)  Petitioner admitted that he committed prohibited acts as

factually detailed in an incident report, but objected to being charged with

possession of a hazardous tool.  (*Id.*)  Petitioner also objected to the presence of

a member of the UDC, Counselor Krueger, at his initial hearing due to past

conflicts.  (*Id.*)  The UDC determined that it could not impose sanctions for the

offense because of the severity of the hazardous tool charge and referred the

charges to the Discipline Hearing Officer ("DHO"), as required by the Prohibited

Acts Code.  (*Id.*)  As instructed by the Prohibited Acts Code, the UDC also

recommended that Petitioner receive 21 days of disciplinary segregation and loss

of 40 days good conduct time.  (*Id.*)

On April 26, 2006, prior to the hearing before the DHO, Petitioner signed a

document acknowledging that he had been advised of his rights before the DHO

and that he was aware that a finding that he committed the prohibited acts could

result in a rescission or retardation of his presumptive or effective parole date.

(*Id.* ¶ 6, Attach. B. at 8.)  Petitioner was also informed of the specific charges

against him, and he indicated that he wished to have a staff representative

_____

(Footnote continued from previous page)
C.F.R. § 541.13 set forth a Code of Prohibited Acts and the disciplinary sanctions
available.  *See* 28 C.F.R. § 541.13, Table 3.

present[2] and call the inmate he was tattooing as a witness at the DHO hearing. (*Id.*at 9.)

The DHO held a hearing on May 2, 2006, on the three charges for the April 23, 2006 incident.  (Doc. No. 1., Ex. B. at 1.)  At the hearing, in addition to the incident report and investigation information, the DHO considered documentary evidence, namely, photographs of the tattooing equipment and the tattoos on the other inmate's body, as well as the artwork used in the tattooing process,.  (*Id.*)  In Petitioner's defense, Petitioner's staff representative questioned whether Petitioner could be charged simultaneously with an offense in the most severe category of prohibited acts and another offense in the least severe category.  (*Id.*; Norenberg Decl. ¶ 6.)  The representative also pointed out to the DHO that this was Petitioner's first offense since his confinement began, and questioned whether inmates were aware that possession of a tattoo gun and other tattooing equipment could be charged in the most severe category.  (Doc. No. 1, Ex. B at 1.)  Petitioner also provided a statement at the hearing that was summarized by the DHO as follows:

> YES I HAD A TATTOO GUN.  I GOT IT FROM A GUY THAT LEFT ABOUT A MONTH AGO.  HE LEFT HIS TATTOO GUN AND ART WORK TO SEE IF I WANTED TO TRY DOING IT.  IT WAS DUMB AND I ADMIT THAT.  I WAS IN AN UNAUTHORIZED AREA AND I ADMIT TO TATTOOING THE OTHER INMATE.

---

[2]      At the DHO hearing the staff representative's "role is to help the inmate present the best defense possible to the charged violations."  (Norenberg Decl. ¶ 6 at 11.)

(*Id.*)  The inmate who Petitioner had been tattooing also provided a statement, indicating that Petitioner gave him a tattoo, used alcohol pads and rubber gloves while doing so, cut the tattoo needle with fingernail clippers, and washed the needle with alcohol before using it.  (*Id.*)

On May 11, 2006, the DHO determined that Petitioner had violated each of the three charges and imposed the following sanctions: (1) 40 days loss of good conduct time, 30 days of disciplinary segregation, and 90 days loss of personal property after release from a special housing unit for possession of a hazardous tool; (2) 90 days loss of commissary privileges for tattooing or self-mutilation; and (3) 15 days disciplinary segregation for being in an unauthorized area.  (*Id.* at 2.) The DHO based its decision on the observations of the staff member who personally witnessed the April 23, 2006 incident, the photographic evidence, and the Petitioner's admissions.  (*Id.*)  Specifically, with respect to the possession of a hazardous tool charge, the DHO explained:

> The possession and manufacture of a tattoo gun is considered a hazardous tool.  Specifically, tattooing and possessing a tattoo gun clearly increases the potential to spread infectious diseases.  The recovered contraband endangers both staff and inmate's (sic) by having needles that penetrate skin, causing residues from bodily fluids to be present on the needles.  The contraband [Petitioner] admit[s] possessing has the potential to penetrate a staff member's skin while conducting routine searches, creating an increased probability of injury, and a direct risk to the personal safety and health of the staff member.

(*Id.*)

On May 25, 2006, Petitioner then filed an administrative remedy appeal

arguing that the possession of a hazardous tool charge was too severe for the charged conduct.  (Doc. No. 1, Ex. C at 1.)  First, Petitioner asserted that "up until a few months [before Petitioner's appeal] the possession of a tattoo gun ha[d] been charged as a [less severe offense and that] inmates at FMC Rochester were not given notice of a change [in the policy of charging possession of a tattoo gun] via memo." (*Id.*)  Second, Petitioner argued that a tattoo gun did not qualify as a hazardous tool because "it cannot be used in an escape attempt, as a weapon capable of doing serious bodily harm . . . and, further steps were taken [by Petitioner] in the presence of the reporting officer to insure safty [sic]." (*Id.* at 2.)  Finally, Petitioner argued that under the Prohibited Acts Code, the impoundment of a prisoner's personal property can only occur when that property was relevant to the related offense.  He asserted that FMC Rochester violated this provision by impounding all his personal property including property not related to the charged offense. (*Id.*)  Petitioner requested dismissal of the hazardous tool charge, restoration of the good conduct time lost, and the return of all property not related to the offense.[3] (*Id.*)

On August 2, 2006, the Federal Bureau of Prisons North Central Regional

---

[3]     At this stage, Petitioner has not raised the argument that the impoundment of his personal property unrelated to this offense was a violation of prison discipline regulations.  Nor has he requested relief in the form of return of his personal property.  Neither his petition for habeas relief, motion for default judgment, reply to the response to the petition, nor motion to amend the petition raises the issue.  Therefore this Court declines to review Respondent's imposition of that sanction for Petitioner's conduct.

Office ("Regional Office") – the administrative body to which Petitioner appealed – determined that "[a]fter a thorough review of the Incident Report and related documentation, it appears that a reconsideration of the charge is necessary" (Doc. No. 1, Ex. D), and directed the DHO to conduct a rehearing. (Norenberg Decl. ¶ 9.)  Following rehearing, the DHO maintained that the evidence supported a finding that Petitioner violated the possession of a hazardous tool charge and upheld the original sanctions previously imposed at the initial hearing.  (Doc. No. 1, Ex. E at 2.)  The DHO modified its original determination, however, by concluding that the charge for tattooing or self-mutilation was sufficiently addressed and sanctioned under the hazardous tool provision.  (*Id.*)

Petitioner again appealed the DHO's determination that the evidence supported a finding that Petitioner violated the prohibition against possession of a hazardous tool.  (Doc. No. 1, Ex. F at 1.)  Petitioner argued that possession of a tattoo gun had historically been charged as a violation of a less severe provision in the Prohibited Acts Code barring possession of unauthorized property and that FMC Rochester failed to inform the inmate population of the increased severity of the offense that could be charged.  (*Id.* at 2.)  Petitioner claimed that the failure to provide notice of the change violated his due process rights.  (*Id.* at 1.)  The Regional Office concluded that Petitioner had been appropriately charged and rejected Petitioner's due process argument on the ground that "[t]here has not been a discipline code change for this prohibited act."  (Doc. No. 1, Ex. G.)

On December 20, 2006, Petitioner filed an administrative remedy appeal with the Federal Bureau of Prisons Central Office ("Central Office"), challenging the Regional Office's decision.  (Doc. No. 1, Ex. H.)  Petitioner argued that the inmate population never received notice regarding a change in the treatment of possession of tattoo guns and other tattooing equipment.  (*Id.* at 1.)  The Central Office rejected Petitioner's argument because hazardous tools are "characterized as tools most likely to be use [sic] in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others, or those hazardous to institutional security or personal safety."  (Doc. No. 1, Ex. I.)  The Central Office noted that the tattoo gun in Petitioner's possession "was capable of doing serious bodily harm to others by the possible transmission of infectious diseases."  (*Id.*)

On March 24, 2008, Petitioner filed the current petition for a writ of habeas corpus requesting that the hazardous tool violation be removed from his record and the 40 days of good conduct time lost be restored.  (Doc. No. 1 at 5.)  In the petition, Petitioner alleges that confidential information was used by the DHO in support of its findings and not revealed to Petitioner, in violation of his due process rights.  (*Id.* at 3.)  Petitioner reiterates the argument that FMC Rochester failed to provide notice that possession of tattoo guns or equipment would be charged at the most severe level for violations of the Prohibited Acts Code.  (*Id.* at 5.)  Petitioner also raises the argument that his possession of a tattoo gun could not be charged as possession of a hazardous tool because he did not have the requisite intent required for such a violation.  (*Id.*)

8

On March 26, 2008, United States Magistrate Judge Arthur S. Boylan issued an Order Directing Respondent to Show Cause Why Writ Should Not be Granted (Doc. No. 3), which instructed Respondent to file, within 30 days, an answer to Petitioner's habeas corpus petition.  Thirty days later, on April 25, 2008, Respondent filed the Government's Response to Ward's Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241.  (Doc. No. 5.)  That same day, Respondent filed a Certificate of Service, indicating that the electronic filing of Respondent's response to the petition qualified as service on Petitioner according to electronic case filing procedures for the District of Minnesota (Doc. No. 5 at 15), and the Declaration of Ann Norenberg in support of its response (Doc. No. 6, Norenberg Decl.).  In its response, Respondent argues that the hearings on Petitioner's incident were conducted in accordance with due process because Petitioner received adequate notice of the charges, an impartial hearing, an opportunity to present his case, and a written report of the decision, and because there was sufficient evidence to support the DHO's findings.  (Doc. No. 5 at 7-13.)

On May 7, 2008, Petitioner filed a Motion for Default Judgment (Doc. No. 7), seeking judgment against Respondent on the ground that Petitioner had not yet received the response required by the March 26, 2008 Order.  On May 14, 2008, Petitioner also filed Petitioner's Reply to Government's Response to Ward's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241.  (Doc. No. 8.)  Finally, on July 15, 2008, Petitioner filed a Motion to Amend Petition of

Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J (Doc. No. 11), in which Petitioner argues that another inmate found in possession of tattooing needles received a less severe charge than Petitioner.

## II.    Review of Prisoner Disciplinary Proceedings

"The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  Though the full panoply of rights in a criminal case are not available in a prisoner discipline matter, prisoners retain due process rights under the Constitution.  *See, e.g.*, *Espinoza v. Peterson*, 283 F.3d 949, 952 (8th Cir. 2002) (citing *Wolff v. McDonald*, 418 U.S. 539, 555-56 (1974)).  Thus, habeas relief may be appropriate if the disciplinary proceedings violate federal law or deprive a prisoner of a constitutionally protected liberty or property interest without due process of law.  Because prisoners have a liberty interest in good-time credit, prison officials are required to provide due process before interfering with that right.  *Id.*  The process due to a prisoner in a prison disciplinary proceeding includes: (1) advanced written notice of the charged violations; (2) an opportunity to be heard before an impartial decision-maker; (3) the opportunity to call witnesses and present evidence; and (4) a written statement from the fact-finder of the reasons for the decision.  *Id.*; *see also Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

Prison disciplinary actions must also be supported by at least "some

evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).  Determining

whether the "some evidence" standard is satisfied depends on "whether there is

any evidence in the record that could support the conclusion reached by the

disciplinary board."  *Id.*

## III.   Analysis of Petitioner's Arguments

### A.   Default Judgment

Petitioner argues that he is entitled to default judgment on the ground that

the factual background for the Government's response to his petition is based

entirely on the Declaration of Ann Norenberg, which Petitioner asserts he did not

receive.  However, a default judgment and issuance of the writ of habeas corpus

are not appropriate remedies for the failure of the respondent to file a timely

response to the petition.[4]  *See Hale v. Lockhart*, 903 F.2d 545, 547 (8th Cir.

---

[4]    Other courts that have considered the question have also determined that
a respondent's failure to file a timely return in a habeas proceeding does not
entitle a prisoner to entry of default judgment and issuance of the writ.  *See, e.g.*,
*Lemons v. O'Sullivan*, 54 F.3d 357, 364-65 (7th Cir. 1995) (finding no abuse of
discretion in district court's denial of prisoner's motion for default judgment and
noting that default judgment is disfavored in habeas corpus cases); *Bleitner v.
Welborn*, 15 F.3d 652, 653-54 (7th Cir. 1994) (noting that default judgment is
disfavored in habeas corpus cases, that the writ should not be a remedy for
technical violations, and that a district court should consider the merits of a
petition if a state fails to file a response); *Aziz v. Leferve*, 830 F.2d 184, 187 (11th
Cir. 1985) (directing district court to consider the merits of a habeas petition
despite failure of respondent to file timely answer to the petition); *Allen v. Parini*,
424 F.2d 134, 138 (6th Cir. 1970) (concluding that the State of Ohio's failure to
file a timely return to a habeas petition did not afford a basis for instant relief on
prisoner's motion for default judgment); *Wallace v. Heinz*, 351 F.2d 39, 40 (9th
Cir. 1965) (determining that a prisoner was not entitled to writ of habeas corpus
by default judgment because respondent state failed to file its return to an order
(Footnote continued on following page)

1990).  The Eighth Circuit has noted that "no court has ordered a habeas writ to issue solely because of delay."  *Id.*  Therefore, this Court recommends that Petitioner's Motion for Default Judgment (Doc. No. 7) be denied.

Even assuming, for the sake of argument, that an entry of default judgment and issuance of the writ were appropriate remedies for a habeas respondent's failure to comply with a deadline to answer the petition, here this Court can only conclude that Respondent complied with just such a deadline set by the March 26, 2006 Order.  (*See* Doc. No. 3.)  Respondent electronically filed its response to the Petitioner's habeas petition on April 25, 2006, within the 30-day period established by the March 26, 2006 Order.  Respondent also electronically filed a certificate of service indicating compliance with the electronic case filing requirements for the District of Minnesota.  In addition, Respondent's April 25, 2006 filings included the Ann Norenberg Declaration, the alleged absence of which Petitioner claims supports his motion for default judgment.

### B.    Petitioner's "No Evidence" Argument

Petitioner next argues that there was "NO evidence" to support the disciplinary decision with respect to the hazardous tool charge because, in order to find a violation of such a charge, "the Government must show, in some way, that Petitioner's tattoo gun was intended for the purpose described in Code #108 and the D.H.O. decision."  (Doc. No. 8 at 2-3, 5.)  Petitioner argues that

(Footnote continued from previous page)
to show cause within the statutory period).

Respondent failed to provide any such evidence of Petitioner's intent.

Respondent argues that there is sufficient evidence to support the determination

that Petitioner committed the prohibited act of possessing a hazardous tool

because the DHO considered the statement of the reporting officer, Petitioner's

admissions, the other inmate's statement, and documentary photographic

evidence.  (Doc. No. 5 at 13.)

Petitioner did not dispute at any part of the proceedings before the prison

disciplinary authorities, and does not dispute now, that he possessed a tattoo

gun and other tattooing equipment at the time of the incident.[5]  Given such an

admission, Petitioner's claim that there was insufficient evidence to find that he

violated Prohibited Acts Code 108 hinges on whether that provision requires

evidence that a prisoner intended to use the tool for the purpose of escape, as a

weapon, or as a hazard to institutional or personal safety.  *See* 28 C.F.R.

§ 541.13, Table 3 (defining a hazardous tool as those implements most likely to

be used in an escape or an escape attempt, as weapons capable of doing

serious bodily harm, or that are hazardous to institutional security or personal

---

[5]     Petitioner has admitted to possessing the tattoo gun and other tattooing
equipment, and there was documentary evidence and a statement by the
reporting officer presented at the DHO hearing that Petitioner possessed such
devices.  This Court concludes that Respondent satisfied its burden of
establishing that "some evidence" exists to support the disciplinary decision.  *See*
*Hill*, 472 U.S. at 455.  Therefore, to the extent that Petitioner's contentions can be
construed to raise a challenge to the sufficiency of the evidence supporting a
violation of Prohibited Acts Code 108, this Court recommends that the petition be
denied.

safety).  Petitioner's challenge to the sufficiency of evidence is more appropriately analyzed as an issue of interpretation of the federal rule he was charged with violating.  Therefore, the question presented by this argument is whether the Bureau of Prisons could permissibly interpret Prohibited Acts Code 108 to mean that a prisoner found with a tattoo gun and tattooing needles possessed a "hazardous tool" even where no evidence exists of the prisoner's intent to use it for a purpose related to the definition of "hazardous tool."

The Bureau of Prisons' interpretation of its own regulation prohibiting possession of a hazardous tool is controlling unless it is plainly erroneous or inconsistent with the regulation.  *See Robinson v. Warden*, 250 Fed. App'x. 462, 464, 2007 WL 2949132, at *2 (3d Cir. 2007) (concluding that Bureau of Prisons' interpretation of hazardous tool to include a cell phone was neither plainly erroneous nor inconsistent with the agency's own regulations).  Prohibited Acts Code 108 classifies the following as an offense in its "Greatest Category" of prohibited acts:

> Possession, manufacture, or introduction of a hazardous tool (Tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hack-saw blade)

28 C.F.R. § 541.13, Table 3.

On its face, Prohibited Acts Code 108 does not require any evidence of a prisoner's intent in order to determine that possession, manufacture, or introduction of a hazardous tool has occurred.  *See* 28 C.F.R. § 541.13, Table 3.

14

The regulation provides some guidance on how the Bureau of Prisons defines the term "hazardous tool."  Possession of those tools "most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety" are prohibited by the regulation's plain words.  The regulation does not specify, however, that a prisoner's possession of an implement need be accompanied by intent to use it for any purpose.  Rather than require the intent urged by Petitioner to be necessary for finding a violation, the regulation's language prohibits possession of devices with the *potential* to be used in an escape, as a weapon, or to be hazardous to security or personal safety.  Here the DHO interpreted Prohibited Acts Code 108 to proscribe possession of a tattoo gun and tattooing needles because they have the potential both to spread infectious diseases to prison staff and other inmates and to puncture the skin of prison staff during searches, thus directly threatening personal safety.  Given the absence of a requirement that a prisoner intend to use a tattoo gun for an escape, as a weapon, or for the purpose of threatening institutional security or personal safety, this Court considers the Bureau of Prisons' interpretation to be neither plainly erroneous nor inconsistent with the regulation.  Therefore, this Court recommends that this ground for Petitioner's challenge be denied.

**C.    Due Process**

**(i)    Confidential Information**

Petitioner argues that confidential information used by the DHO in support

of the DHO's findings was not revealed to Petitioner and was documented in a separate record.  (Doc. No. 1 at 3.)  He argues that the use of this confidential information violated his due process rights as he was not made aware of the evidence against him.  (*Id.* at 4.)

The use of confidential information in prisoner disciplinary proceedings is not strictly forbidden.  *See Espinoza*, 283 F.3d at 952.  For instance, "because the overarching due process concern is whether 'some evidence' supports the disciplinary decision, a reviewing court must examine the reason for non-disclosure and the reliability of the confidential informant only in cases where confidential information is needed to satisfy the some evidence standard."  *Id.*

However, this Court need not reach the question whether confidential information was needed to satisfy the "some evidence" standard because the DHO report makes it clear that confidential information was not used. Petitioner's argument refers to a portion of the DHO report, which appears to be an official Bureau of Prisons form, containing some pre-typed information and corresponding blank sections for the DHO to provide information specific to an individual incident.  (*See* Doc. No. 1, Ex. B ¶ III.D.)  The portion of the form regarding confidential information reads as follows:

> Confidential information was used by the DHO in support of his findings, but was not revealed to the inmate.  The confidential information was documented in a separate record.  The confidential information has been (confidential informants have been) determined reliable because:

(Doc. No. 1, Ex. B ¶ III.D.)  Immediately after the colon concluding this portion of

16

the report, the DHO entered the following notation: "N/A".  (*Id.*)  This notation, and the form as a whole, plainly indicates that no confidential information was used in support of the DHO's findings.[6]  This Court concludes that Petitioner misreads the meaning of the report.  Therefore, this Court recommends that Petitioner's challenge to the disciplinary decision on this ground be denied.

### (ii)   Change of Policy/Lack of Notice

Petitioner next argues that his due process rights were violated because FMC Rochester failed to inform its inmate population in advance that it had changed a policy and would begin charging possession of a tattoo gun and tattooing equipment as a violation of Prohibited Acts Code 108.  (Doc. No. 1 at 5; Doc. No. 8 at 4.)  Petitioner contends that FMC Rochester did not comply with its internal policy of posting a memo to the inmate population thirty days in advance of altering its previous position that tattooing should be treated as a violation of Prohibited Acts Code 305, which forbids possession of any item not authorized by prison officials.  (Doc. No. 1 at 5.)  Respondent argues that: (1) due process requires that advance notice of the charges against a prisoner be provided, and

---

[6]      Those portions of the form filled out by the DHO in Petitioner's case are distinguished from the pre-typed information by the typeset used.  The pre-typed information includes both upper- and lower-case lettering whereas the information entered by the DHO appears in all capitalized letters.  *See* quotation *supra*, at p. 4.  The passage on confidential information relied on by Petitioner is set in the conventional type used throughout the form for pre-typed information. The exception to this distinction appears in the portion of the report explaining the specific evidence relied upon by the DHO and the reasoning behind the DHO's decision.  It is notable that this passage does not mention any reliance by the DHO on confidential information.  (*See* Doc. No. 1, Ex. B ¶ V.)

Petitioner received ample notice of the charges prior to the DHO hearing; and (2) "[t]here was no 'policy change' concerning how staff were to handle incident reports involving tattooing equipment." (Doc. No. 5 at 9.)

Respondent is correct that Petitioner received the advanced written notice necessary to satisfy due process as established in *Wolff v. McDonald*, 418 U.S. 539, 564 (1974). There, the Supreme Court held that "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." *Id.* On April 26, 2006, prior to the DHO hearing, Petitioner received a written Notice of Discipline Hearing Before the DHO. (Norenberg Decl. ¶ 6, Attach. B at 9.) The notice indicates the alleged violations, including "possession of a hazardous tool, being in an unauthorized area, [and] tattooing." (*Id.*) It next states that Petitioner was "being referred to the DHO for [those] charge(s)" and informs Petitioner of his right to have a staff representative and call witnesses at the DHO hearing. (*Id.*) Petitioner signed the form and returned it to the DHO as the notice instructs. (*Id.*) Respondent's use of this form clearly constitutes the notice necessary to satisfy the requirements of due process.

Petitioner's argument regarding FMC Rochester's failure to provide notice of an alleged change in its handling of incidents involving inmates' possession of tattooing equipment raises concerns other than those identified in *Wolff* as implicating due process. Specifically, Petitioner contends that pursuant to the Bureau of Prisons Policy Statement 5270.27, Ch. 2, "when sanctions and/or

Code violations change for prohibited conduct that had been treated as another

less severe Code violation, the inmate population [at FMC Rochester] were [sic]

provided with a notice in the form of an 'Memorandum For Inmate Population.'"

(Doc. No. 1, Ex. H at 2.)  Petitioner suggests that, because no such memo was

provided identifying that possession of a tattoo gun and other tattooing

equipment would be charged as a violation of Prohibited Acts Code 108, he

should not have been charged with that violation.

Federal Bureau of Prisons Program Statement 5270.27, Ch. 2, contains

language identical to 28 C.F.R. § 541.11.  These regulations provide:

> Staff shall advise each inmate in writing promptly after arrival
> at an institution of:
> (a) The types of disciplinary action which may be taken by
> institution staff;
> (b) The disciplinary system within the institution and the time
> limits thereof . . . ;
> (c) The inmate's rights and responsibilities . . . ;
> (d) Prohibited acts and disciplinary severity scale . . . ; and
> (e) Sanctions by severity of prohibited act, with eligibility for
> restoration of forfeited and withheld statutory good time . . . .

*See* 28 C.F.R. § 541.11.  Program Statement 5270.27, Ch. 2, further directs the

institution to provide this information to each inmate in pamphlet form as part of

its admission and orientation program.  United States Department of Justice,

Federal Bureau of Prisons, Program Statement 5270.07, Inmate Discipline and

Special Housing Units, Ch. 2, p. 1 (Dec. 29, 1987), http://bop.gov/Data

Source/execute/dsPolicyLoc.

All that these provisions require is that prison authorities provide inmates

with information regarding the disciplinary system within the institution, such as the types of actions that can be taken, the timing of the disciplinary system, and the prohibited acts and corresponding sanctions.  There is nothing in the record to suggest that FMC Rochester failed to follow this regulation and policy statement.  Notably, the Program Statement does not require prison officials to post a memorandum if they determine that specific conduct will be interpreted as a violation of a different provision in the disciplinary code that it had been previously.  Neither the Program Statement nor 28 C.F.R. § 541.13 requires prison officials to provide notice of whether a specific form of conduct falls within the boundaries of their interpretation of the Prohibited Acts Code's provisions. Therefore, this Court recommends that Petitioner's challenge to the disciplinary decision on this ground be denied.

While pursuing administrative remedies before the Regional and Central Offices, Petitioner apparently attached examples of memoranda FMC Rochester provided, notifying its prison population of changes in how it would charge certain conduct.  (*See* Doc. No. 1, Ex. F at 2 & Ex H. at 2.)  Petitioner apparently provided the Central Office with an example of an "adjustment [of a Prohibited Acts Code 108 violation to a 305 violation] provided to other inmates who were not informed of an increased Code violation for certain behavior at least thirty days in advance."  (*See* Doc. No. 1, Ex. H at 2.)  By at least colorably raising this issue in his habeas case, Petitioner appears to be contending that FMC Rochester has an established internal policy of providing notice to its inmate

population of changes in how it charges certain conduct, that such a change took place here, and that FMC Rochester failed to comply with that internal policy. However, Petitioner has provided none of the examples that he apparently relied on to support his argument before the administrative decision-makers.  Without such documentation, this Court cannot evaluate the merits of Petitioner's argument.  Therefore, to the extent that Petitioner contends that Respondent's failure to comply with this alleged internal policy violated his constitutional rights or resulted in a disciplinary decision contrary to other federal law, Petitioner has failed to meet his burden.  This Court recommends that Petitioner's challenge on this ground be denied.

Along similar lines, Petitioner's Motion to Amend Petition of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J (Doc. No. 11) alleges that another inmate was not charged with a violation of Prohibited Acts Code 108, but rather, with the less severe violation of Code 305, for similar conduct. (Doc. No. 11, Ex. J.)  Exhibit J is a copy of an incident report for another FMC Rochester inmate charged with a violation of both Prohibited Acts Code 108 and Code 305, but only finding a violation of the latter.  (Doc. No. 11, Ex. J.)  The incident reported in Exhibit J involves the reporting officer's discovery, during a "random shakedown" of the inmate's room, of nine pieces of wire, which appeared to be tattoo needle, in a shirt hanging in the inmate's area.  (*Id.*)  Upon questioning the inmate, the officer reported that the inmate did not possess a tattoo gun.  (*Id.*)  Initially, the inmate was charged with possession of a

hazardous tool, and the UDC assumed that sanctions were unavailable.

However, after initially referring the matter to the DHO for imposition of sanctions,

the incident was returned to the UDC, which found that the inmate committed a

violation only of Prohibited Acts Code 305.  (*Id.*)

Based on that information Petitioner has argued that "[i]t is obvious that the

[Bureau of Prisons], and especially FMC-Rochester have re-thought their policy

of how to charge an inmate with possession of needles."  (Doc. No. 11 at 2.)

Petitioner appears to be arguing that the charge of a less severe violation of the

Prohibited Acts Code reflected in Exhibit J supports his contention that FMC

Rochester has changed its policy without providing notice, thus contravening

Petitioner's reading of Policy Statement 5270.07.  Because this Court has

concluded that nothing in Policy Statement 5270.07 – nor in 28 C.F.R. § 541.11 –

requires FMC Rochester to notify an inmate of changes in how specific conduct

will be treated, this Court recommends that Petitioner's Motion to Amend Petition

of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J (Doc. No. 11)

be denied as moot.

### (iii)   Lack of Impartial Decision-maker

Petitioner argues that his due process rights were violated due to past

conflicts between Petitioner and a member of the UDC, which recommended

sanctions to the DHO in his case.  (*See* Doc. No. 8 at 4.)  Petitioner contends

that the administrative proceedings in his case failed to afford him due process

because they did not comply with the requirements of *Wolff v. McDonald*, and its

progeny, that prisoner disciplinary decisions be determined by an impartial decision-maker.  *See* 418 U.S. at 571; *see also Scruggs*, 485 F.3d at 939. Although Petitioner acknowledges that the allegedly-conflicted member of the UDC was not responsible for the ultimate determination that Petitioner violated provisions of the Prohibited Acts Code, Petitioner nevertheless argues that the conflicted member "should not have been allowed to be part of the U.D.C. hearing nor make any sanction recommendation to D.H.O."  (Doc. No. 8 at 4.)

Petitioner has failed to present any information related to the "past conflicts" between Petitioner and the member of the UDC to whose involvement he now objects that would permit a conclusion by this Court that the disciplinary proceedings below failed to afford Petitioner due process.  Without some clarification of what those conflicts were, and how they may have impacted the disciplinary proceedings below, the record before the Court indicates only that the UDC complied with the procedures mandated by the federal regulations at issue.  For instance, the UDC is required by 28 C.F.R. § 541.13, Table 3, to "refer all Greatest Severity Prohibited Acts to the DHO *with recommendations* as to an appropriate disposition."  (Emphasis added).  Nothing in the record indicates that adherence to this procedure was somehow corrupted by the bias of any member of the UDC or any other decision-making body.  Therefore, this Court recommends that Petitioner's challenge to the disciplinary decision on this ground be denied.

## **RECOMMENDATION**

Based on the foregoing and all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Petitioner's Motion for Default Judgment (Doc. No. 7) be **DENIED**;

2.     Petitioner's Motion to Amend Petition of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Add Exhibit J (Doc. No. 11) be **DENIED AS MOOT**; and

3.     Petitioner's Petition of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (Doc. No. 1) be **DISMISSED WITH PREJUDICE**.

Dated:  September 26, 2008

_s/ Jeffrey J. Keyes_____
JEFFREY J. KEYES
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by October 15, 2008, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.